Slip Op. 12- 45

# UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————————— :
                                                                            :
LIFESTYLE ENTERPRISE, INC., TRADE         :
MASTERS OF TEXAS, INC., EMERALD HOME   :
FURNISHINGS, LLC, RON'S WAREHOUSE        :
FURNITURE D/B/A VINEYARD FURNITURE        :
INTERNATIONAL LLC,                                            :
                                                                            :
        Plaintiffs,                                                     :
                                                                            :
        and                                                               :
                                                                            :
DREAM ROOMS FURNITURE (SHANGHAI)      :
CO., LTD., GUANGDONG YIHUA TIMBER          :
INDUSTRY CO., LTD.,                                         :
                                                                            :
        Consolidated Plaintiffs,                              :
                                                                            :
ORIENT INTERNATIONAL HOLDING                 :
SHANGHAI FOREIGN TRADE CO., LTD.,           :
                                                                            :
        Intervenor Plaintiff,                                     :
                                                                            :
        v.                                                                 :     Before: Jane A. Restani, Judge
                                                                            :
UNITED STATES, UNITED STATES                  :     Consol. Court No. 09-00378
DEPARTMENT OF COMMERCE                       :
                                                                            :     **Public Version**
        Defendants,                                                  :
                                                                            :
        and                                                               :
                                                                            :
AMERICAN FURNITURE MANUFACTURERS    :
COMMITTEE FOR LEGAL TRADE,                   :
VAUGHAN-BASSETT FURNITURE                    :
COMPANY, INC.                                                  :
                                                                            :
        Intervenor Defendants.                                 :
————————————————————————— :

## OPINION AND ORDER

[Commerce's <u>Remand Results</u> remanded in part, affirmed in part.]

Dated: March 28, 2012

      <u>Jill A. Cramer</u>, Mowry & Grimson, PLLC, of Washington, DC, and <u>John D. Greenwald</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiffs. With them on the brief were <u>Kristin H. Mowry</u>, <u>Jeffrey S. Grimson</u>, <u>Sarah M. Wyss</u>, and <u>Susan L. Brooks</u>.[1]

      <u>William E. Perry</u>, Garvey Schubert Barer, of Washington, DC, for consolidated plaintiff, Dream Rooms Furniture (Shanghai) Co., Ltd.

      <u>John D. Greenwald</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, and <u>Patrick James McLain</u>, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, for consolidated plaintiff, Guangdong Yihua Timber Industry Co., Ltd.

      <u>Nancy A. Noonan</u> and <u>Matthew L. Kanna</u>, Arent Fox LLP, of Washington, DC, for intervenor plaintiff.

      <u>Carrie A. Dunsmore</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Stuart F. Delery</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, and <u>Stephen C. Tosini</u>, Senior Trial Counsel.  Of counsel on the brief was <u>Shana Hofstetter</u>, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

      <u>J. Michael Taylor</u>, King & Spalding, LLP, of Washington, DC, argued for intervenor defendants. With them on the brief were <u>Joseph W. Dorn</u>, <u>Daniel L. Schneiderman</u>, and <u>Prentiss Lee Smith</u>.

      Restani, Judge: This matter comes before the court following the court's decision

in <u>Lifestyle Enterprise, Inc. v. United States</u>, 768 F. Supp. 2d 1286 (CIT 2011), in which the

court remanded <u>Wooden Bedroom Furniture from the People's Republic of China: Final Results

of Antidumping Duty Administrative Review and New Shipper Reviews</u>, 74 Fed. Reg. 41,374

---

    [1] Mowrey & Grimson, PLLC withdrew as counsel for Ron's Warehouse Furniture on January 6, 2011.  The court gave Ron's Warehouse Furniture thirty days to retain counsel.  It has not done so as of the date of this opinion.

(Dep't Commerce Aug. 17, 2009) ("<u>Final Results</u>") to the United States Department of

Commerce ("Commerce" or the "Department").  For the reasons stated below, the court finds

that Commerce failed to comply with the court's remand instructions with regard to two

contested issues.

## BACKGROUND

The facts of this case have been well-documented in the court's previous opinion.

<u>See</u> <u>Lifestyle Enter.</u>, 768 F. Supp. 2d at 1293  95.  The court presumes familiarity with that

decision but briefly summarizes the facts relevant to this opinion.

The plaintiffs, Lifestyle Enterprise, Inc. ("Lifestyle"), Orient International Holding

Shanghai Foreign Trade Co., Ltd. ("Orient"), Guangdong Yihua Timber Industry Co., Ltd.

("Yihua Timber"), Dream Rooms Furniture (Shanghai) Co., Ltd., Ron's Warehouse Furniture,

Emerald Home Furnishings, LLC, and Trade Masters of Texas, Inc., and defendant-intervenors

American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture

Company, Inc. (collectively "AFMC") challenged the final results of an administrative review of

the antidumping ("AD") duty order on wooden bedroom furniture from the People's Republic of

China ("PRC" or "China"), which assigned Orient a weighted average dumping margin[2] of

---

[2] A dumping margin is the difference between the normal value ("NV") of merchandise and the price for sale in the United States.  <u>See</u> 19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35). Unless nonmarket economy methodology is used, an NV is either the price of the merchandise when sold for consumption in the exporting country or the price of the merchandise when sold for consumption in a similar country.  19 U.S.C. § 1677b(a)(1).  An export price or constructed export price is the price that the merchandise is sold for in the United States.  19 U.S.C. § 1677a(a)-(b).  Under its nonmarket economy AD methodology, Commerce calculates NV "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers,
(continued...)

216.01% as part of the PRC-wide entity and Yihua Timber the dumping margin of 29.89%.  See

Final Results, 74 Fed. Reg. at 41,380; Wooden Bedroom Furniture from the People's Republic of

China: Amended Final Results of Antidumping Duty Administrative Review and New Shipper

Reviews, 74 Fed. Reg. 55,810, 55,810 (Dep't Commerce Oct. 29, 2009).  Upon considering the

parties' motions for judgment on the agency record, the court held that substantial evidence did

not support denial of a separate rate for Orient and that the rate of 216.01% assigned to Orient

was not corroborated.  Lifestyle Enter., 768 F. Supp. 2d at 1296 99.  The court also held that

substantial evidence did not support the Department's decisions on the data set for wood inputs,

the choice of tariff heading for the surrogate value of medium density fiberboard, whether two

companies produced comparable merchandise or used a comparable production process, negative

export pricing, and surrogate labor value.[3]  Id. at 1314 15.  The court remanded for

reconsideration or further explanation.  Id.

On remand, Commerce 1) found "that the information on the record corroborates

the rate of 216.01 percent, as it relates to Orient," based on total adverse facts available ("AFA"),

2) "continue[d] to find that it is appropriate to value wood inputs using [World Trade Atlas

("WTA")] import data," and 3) "decided not to rely on the financial statements of Diretso

---

[2](...continued)
coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  Surrogate values from market
economy countries are used as a measure of these costs.  See id.; GPX Int'l Tire Corp. v. United
States, 715 F. Supp. 2d 1337, 1347 (CIT 2010), aff'd, 666 F.3d 732 (Fed. Cir. 2011).

[3] Commerce's determinations regarding the other issues raised by the parties were upheld
and are not further contested before the court.  See Lifestyle Enter., 768 F. Supp. 2d at 1314 15.

Design[.]"[4]  <u>Remand Results</u> at 8, 18, 31.  Despite Commerce's recent explanation, defendant-

intervenor AFMC continues to contest whether Commerce presented substantial evidence in its

decisions to rely on WTA weight-based data for wood inputs and not to rely on the financial

statements of Diretso Design.  AFMC's Comments Concerning Commerce's Final Results of

Redetermination Pursuant to Remand at 1  2 ("AFMC's Cmts.").  Plaintiff Lifestyle challenges

whether Commerce properly corroborated Orient's rate.  Comments of Lifestyle Enterprise, Inc.,

Trade Masters of Texas, Inc. and Emerald Home Furnishings, LLC on Department of Commerce

July 26, 2011 Final Results of Redetermination Pursuant to Court Remand at 12 ("Lifestyle

Cmts.").  The Government and consolidated plaintiff, Yihua Timber, ask the court to sustain the

<u>Remand Results</u>.  Def.'s Resp. to Pls.' Remand Cmts. at 1 ("Def.'s Resp."); Cmts. of

Consolidated Pl. Guangdong Yihua Timber Ind. Co., Ltd. on the Commerce Dep't's Remand

Determination at 1 ("Yihua Timber Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not

uphold Commerce's final determination in an AD review if it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

---

[4] In the <u>Remand Results</u>, Commerce addressed the tariff heading for medium density fiberboard, comparable production for Global Classic, negative net U.S. prices, and surrogate value for labor on remand; no party now raises these issues.  <u>Final Results of Redetermination Pursuant to Court Remand</u> at 15  16, 19, 22, 31 (Dep't Commerce Aug. 26, 2011) (Docket No. 132) ("<u>Remand Results</u>").  The court reasonably may infer that the parties concur in the resolution of those issues, as set forth in the remand redetermination.  <u>See</u> <u>JTEKT Corp. v. United States</u>, 780 F. Supp. 2d 1357, 1367 (CIT 2011).  Accordingly, the court sustains the resolution of these issues in the remand redetermination.

## DISCUSSION

### I.      Orient's AFA Rate

During an AD review, when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . the administering authority . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  The AD duty rate under such circumstances is known as an AFA rate and may be based on information obtained from: "(1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under . . . [19 U.S.C. § 1675] or determination under . . . [19 U.S.C. § 1675b], or (4) any other information placed on the record."  Id.  Lifestyle challenges the Remand Results on the grounds that Orient's selected AFA rate of 216.01% violates 19 U.S.C. § 1677e(c) because Commerce corroborated the rate with data that were not probative and therefore the rate is not supported by substantial evidence.  Lifestyle Cmts. at 4  7.  Because Commerce failed to corroborate the rate with data that tied the AFA rate to Orient's commercial reality, the court remands the matter to Commerce.

Pursuant to 19 U.S.C. § 1677e(c), "[w]hen the administering authority . . . relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority . . . shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal."  19 U.S.C. § 1677e(c).  Here, the AFA rate of 216.01% is from the 2004  05 review of a new shipper company, Shenyang Kunyu Wood Industry Co., Ltd. ("Kunyu"), and thus is secondary information.  Lifestyle Enter., 768 F. Supp. 2d at 1297.  Commerce must, therefore, corroborate

this information "to the extent practicable."[5]  19 U.S.C. § 1677e(c); <u>see also</u> <u>Gallant Ocean</u>

<u>(Thai.) Co. v. United States</u>, 602 F.3d 1319, 1324 (Fed. Cir. 2010).  In order to corroborate an

AFA rate, Commerce must show that it used "reliable facts" that had "some grounding in

commercial reality." <u>Gallant</u>, 602 F.3d at 1324 (internal quotation marks omitted).  In doing so,

Commerce must tie the AFA rate to the commercial reality of the particular respondent under

review.  <u>Id.</u> (finding transaction-specific margins insufficient for corroboration where

"Commerce did not identify any relationship between the small number of unusually high

dumping transactions with [defendant's] actual rate").[6]

        Congress's intent for "an adverse facts available rate to be a reasonably accurate

estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent

to non-compliance" limits what Commerce may permissibly impose on a non-compliant

respondent.  <u>F.Lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027,

---

[5] In the <u>Remand Results</u>, Commerce stated that "although we recognize the information from the 2004-2005 review (the original basis of the 216.01 percent rate) was supplied by a new shipper company, Kunyu, it is based on actual questionnaire responses and accompanying data of an exporter of wooden bedroom furniture which were not contradicted by any record evidence and were verified during that proceeding." <u>Remand Results</u> at 37.  Thus, Commerce reasons, "[w]e . . . find the 216.01 percent rate to be reliable." <u>Id.</u>  Commerce cannot "proceed[] on the basis that prior calculated margins are <u>ipso facto</u> reliable." <u>Ferro Union, Inc. v. United States</u>, 23 CIT 178, 203, 44 F. Supp. 2d 1310, 1334 (1999).  Rather, it must do more to show relevancy and reliability in relation to Orient's commercial reality.

[6] Where Commerce has selected an AFA rate by assigning the rate of a different comparable, cooperating respondent from a prior administrative review, the court has been satisfied where Commerce has used a rate from the most recently completed segment of the proceeding.  <u>See</u> <u>Tianjin Magnesium Int'l Co. v. United States</u>, Slip Op. 11-100, 2011 WL 3489935, at *3 (CIT Aug. 10, 2011).  Additionally, in <u>Tianjin Magnesium</u>, no reliable data existed for the respondent in either the current or past administrative reviews because the respondent had tampered with and destroyed its accounting books.  <u>Id.</u> at 2  3.

1032 (Fed. Cir. 2000) (invalidating the 46.67% AFA rate imposed by Commerce because, inter

alia, it "was many times higher than [respondent's] actual dumping margin").  Regardless of the

manner of corroboration, Commerce cannot select a rate that does not reflect a reasonable

estimate of a respondent's actual rate.  An aberrantly high AFA rate or a rate diverging

significantly from calculated rates for similarly situated participating companies normally

indicates that a particular AFA rate may not reflect a respondent's commercial reality.[7]  In the

past, Commerce has permissibly imposed rates of 45.49% and 30.95% where those rates were

corroborated using respondents' own sales data.  See PAM, S.p.A. v. United States, 582 F.3d

1336, 1340 (Fed. Cir. 2009) (finding an AFA rate of 45.49% corroborated where Commerce used

twenty-nine sales over 45.49%, totaling just 0.5% of respondent's total U.S. sales during the

current administrative review); Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d

1330, 1339 (Fed. Cir. 2002) (finding an AFA rate of 30.95% valid because it was based on

respondent's actual sales data).  Using a small percentage of individual transactions of the

company under review to corroborate an AFA rate where the record is empty may be valid under

some circumstances, but is not the norm.  Moreover, these two cases not only seem to represent

the outer bounds of minimal corroboration, but also rely upon respondents' own sales data.  Facts

specific to a particular case may make transactions representing a small percentage of sales

---

[7] AFMC could not point to any evidence on or off the record supporting its assertion that any large manufacturing company in any sector was dumping at a rate over 200%.  Indeed, the idea that a large profit-seeking corporation deemed separate from the country-wide entity would dump its merchandise at rates over 200% seems inconsistent with commercial reality, absent some evidence to the contrary.

inadequate corroboration.[8]

      Orient has never been individually examined and therefore Commerce was unable to corroborate the AFA rate using Orient's own data.  Instead, Commerce reasoned that the AFA rate of 216.01% as applied to Orient was relevant and reliable, and therefore, "corroborated to the extent practicable," based on a small percentage of Yihua Timber's transaction-specific dumping margins that were in that range.[9]  Commerce has not addressed the court's comments that

---

    [8] The Government seems to contend that absent record evidence of Orient's transactions, Commerce may extend Ta Chen and PAM to cases using transaction-specific sales of a different respondent, in this case Yihua Timber.  See Def.'s Resp. at 15 16.  Commerce's use of a respondent's own sales data, however, in Ta Chen and PAM mollified concerns that the AFA rate did not represent the commercial reality of those respondents.  See PAM, S.p.A., 582 F.3d at 1340; Ta Chen, 298 F.3d at 1339.  Such concerns arise anew where Commerce uses a different respondent's sales data, as it has here, and Commerce has provided no reasoning to allay concerns that such a method of corroboration does not connect Kunyu's rate to Orient's commercial reality.  Additionally, the need for the AFA rate to reflect the commercial reality of a particular respondent does not evaporate when a respondent has left the record barren.  Even where the record is sparse, Commerce has tools available to it.  See PSC VSMPO-AVISMA Corp. v. United States, Slip Op. 11-115, 2011 WL 4101097, at *2 (CIT Sept. 15, 2011) (finding an AFA rate of 43.58%, one of respondent's sales from a prior review, corroborated where Commerce checked that rate against U.S. sale prices and currency inflation rates); Qingdao Taifa Grp. Co. v. United States, 780 F. Supp. 2d 1342, 1347, 1349 (CIT 2011) (finding an AFA rate of 145.90%, a calculated weighted-average margin using data from the sales of the three models of hand trucks with the highest margins, corroborated because it accounted for 36% of respondent's total sales by quantity and the record was otherwise barren).

    [9] Commerce found that [[       ]] of Yihua Timber's transaction-specific dumping margins were at or above 180%, "which [Commerce found] to be within the range of the 216.01 percent AFA rate," Remand Results at 36, and that [[       ]] of Yihua Timber's transaction-specific dumping margins were at or above 216.01%.  Id. at 55.  Commerce also found that Yihua Timber made more than [[       ]] transactions covering [[       ]] pieces of wooden bedroom furniture "around and above the rate of 216 percent."  Id. at 36.  Lifestyle counters that only [[                    ]] of Yihua Timber's sales by value were dumped at a rate at or above 216.01%.  Lifestyle Cmts. at 5 (arguing that the discrepancy is dependant upon whether one

(continued...)

*Confidential Data Deleted*

Orient's rate increased 3000% from its prior margin[10] and remains "700% greater than the highest separate rate assigned in the review," Lifestyle Enter., 768 F. Supp. 2d at 1299, except to argue that Orient "was not individually examined during that period." Remand Results at 33. Record evidence in the instant case overwhelmingly suggests that 216.01% does not reflect commercial reality. See Gallant, 602 F.3d at 1325 (stating that "the record showed a large body of reliable information suggesting the application of a much lower margin"). First, the rate offered by Commerce is not only from a new shipper review three to four years prior to this administrative review but also an extreme outlier when viewed in light of the prior new shipper reviews, the two previous administrative reviews, and the investigation. Other than the PRC-wide rate, which is itself an AFA rate, prior to this review the highest rate for a cooperating respondent was 49.60% and for a new shipper other than Kunyu was 8.30%.[11] All-others rates

---

[9](...continued)

looks only at the percentage of products which were dumped or at all products imported into the United States during the period of review). The percentage of sales by volume is rarely probative, particularly where Commerce selects small quantity sales that are statistical outliers. Specific transactions are generally uninformative. Sales from a considerably smaller company are insufficient to corroborate an overall rate of 216% for a large importer where such sales amount to only [[                              ]] of all sales by value of the comparison importer.

[10] The court understands that Orient's prior rate was not based on its own data but it was a rate derived from the data of others in the same industry.

[11] Final Determination of Sales at Less Than Fair Value: Wooden Bedroom Furniture from the People's Republic of China, 69 Fed. Reg. 67,313, 67,317 (Dep't Commerce Nov. 17, 2004); Wooden Bedroom Furniture from the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper Reviews, 71 Fed. Reg. 70,739, 70,741 (Dep't Commerce Dec. 6, 2006); Second Amended Final Results of Antidumping Duty Administrative Review: Wooden Bedroom Furniture From the People's Republic of China, 72 Fed. Reg. 62,834, 62,836

(continued...)

Confidential Data Deleted

have oscillated from around 9% at investigation, to around 35% in the first administrative

review, to around 19% in the second administrative review, and to 30% in the current review.

Second, record evidence suggests that Orient's commercial reality differs significantly from the

commercial reality of Kunyu, a much smaller and newer company than Orient.  See Wooden

Bedroom Furniture from the People's Republic of China: Preliminary Results of 2004-2005

Semi-Annual New Shipper Reviews and Notice of Final Rescission of One New Shipper

Review, 71 Fed. Reg. 38,373, 38,378 (Dep't Commerce July 6, 2006) (describing Kunyu as

"small [in] size and [with] rudimentary factory operations"); Lifestyle Cmts. Ex. 2.  Moreover,

because Commerce selected Orient as one of the two largest exporters of wooden bedroom

furniture from China, Commerce cannot now claim no knowledge of Orient's size.  Lifestyle

Enter., 768 F. Supp. 2d at 1293; Remand Results at 58.  Even where Commerce cannot link

respondent's sales to commercial reality because no such sales exist in current or past records,

Commerce cannot choose an AFA rate contradicted by nearly all information on record.  The

record evinces nothing connecting the calculated rate given to Kunyu and the rate given to

---

[11](...continued)
(Dep't Commerce Nov. 7, 2007); Wooden Bedroom Furniture from the People's Republic of
China: Final Results of Antidumping Duty Administrative Review and New Shipper Review, 73
Fed. Reg. 49,162, 49,166 (Dep't Commerce Aug. 20, 2008); Wooden Bedroom Furniture from
the People's Republic of China: Final Results of Fourth New Shipper Reviews, 73 Fed. Reg.
64,916, 64,918 (Dep't Commerce Oct. 31, 2008); Wooden Bedroom Furniture from the People's
Republic of China: Amended Final Results of the January 1, 2007, through July 31, 2007, New
Shipper Reviews, 74 Fed. Reg. 9,386, 9,386 (Dep't Commerce Mar. 4, 2009).  Three other non-
cooperating respondents received the AFA rate of 216.01%.  This rate was upheld as an
individual AFA rate in Fujian Lianfu Forestry Co. v. United States in the first administrative
review.  700 F. Supp. 2d 1361, 1363 (CIT 2010).  The decision does not indicate the percentage
of the respondent's sales which fell within this range or any other specific information that is
instructive here.

Orient.  Thus, Commerce has failed "to show some relationship between the AFA rate and the

actual dumping margin."  Gallant, 602 F.3d at 1325.[12]  Although Orient has placed itself in a

difficult position by not cooperating, the law does not permit Commerce to impose a rate for

punishment purposes.  See 19 U.S.C. § 1677e.  Thus, it is highly unlikely, based on this record,

that the court could sustain a rate similar to the one Commerce assigned Orient in the Remand

Results.  Commerce must make a finding as to what is a reasonable amount to add on to

calculated rates to ensure compliance, based on this industry and this respondent's commercial

reality.[13]  Accordingly, Commerce is instructed to select a reasonable rate for Orient that is

---

[12] Lifestyle offers three additional arguments which not only were not properly raised at the agency level but also are unconvincing.  First, Lifestyle argues that Commerce's decision to look only at transaction-specific dumping margins rather than total U.S. sales constitutes zeroing and is impermissible. Lifestyle Cmts. at 5 (citing JTEKT Corp. v. United States, 642 F.3d 1378 (Fed. Cir. 2011); Dongbu Steel Co. v. United States, 635 F.3d 1363 (Fed. Cir. 2011)).  Lifestyle failed to raise this argument before Commerce.  Additionally, zeroing is permissible.  See Union Steel v. United States, Slip Op. 12-24, 2012 WL 611535, at *11 (CIT Feb. 27, 2012).  Assuming arguendo, zeroing is impermissible as a margin calculation practice, Commerce is not necessarily limited in using zeroing as part of its corroboration methodology.  Second, Lifestyle argues that the AFA rate does not properly reflect Orient's commercial reality because the average unit value ("AUV") for Orient's shipments is similar to the AUV for Yihua Timber's shipments.  Lifestyle Cmts. at 11.  Lifestyle failed to raise this claim below.  Moreover, that the AUV for Yihua Timber and Orient are similar has little bearing on whether Orient is similar in size to Kunyu. (That does not mean that Commerce may not use AUVs to confirm its conclusions, if it so chooses.)  Third, Lifestyle argues that all rates calculated using Commerce's old labor wage rate methodology may no longer be used as bases for AFA rates.  Lifestyle Cmts. at 11.  Lifestyle did not raise this argument before Commerce.  Also, Commerce need not discard an AFA rate merely because an underlying surrogate value methodology has been changed.  "Some inaccuracy is inherent in AFA rates, which are simply a proxy for missing data."  Tianjin Magnesium Int'l, 2011 WL 3489935, at *3 n.4.  Lifestyle's additional arguments, therefore, are unavailing.

[13] Commerce frequently uses the highest rate on record for any prior administrative review of the product in question.  Instead, on these facts, Commerce should start with the highest rate calculated for a comparable respondent or respondents and then add an additional amount to ensure compliance.  See F.Lli De Cecco, 216 F.3d at 1033  34.

consistent with this opinion.

## II.     Database for Wood Input Valuation

As the court previously noted, and the parties agree, the valuation of wood has a

significant impact on the AD margin.  Lifestyle Enter., 768 F. Supp. 2d at 1301 02; Lifestyle

Cmts. at 12.  To determine the surrogate value for wood, Commerce used Philippine Standard

Commodity Classification ("PSCC") 4407.99 for poplar and ash, and PSCC 4407.10 for pine.[14]

See Issues and Decision Memorandum for the Final Results of the 2007 & New Shipper Reviews

Antidumping Duty Administrative Review of Wooden Bedroom Furniture from the People's

Republic of China, A-570-890, POR 1/1/07-12/31/07, at 8 & n.4 (Aug. 10, 2009), available at

http://ia.ita.doc.gov/frn/summary/prc/E9-19666-1.pdf (last visited Mar. 19, 2012) ("Issues and

Decision Memorandum").  Both of these tariff subheadings cover a wider variety of wood,

including various species and higher-moisture content wood not used by Yihua Timber.[15]  Id.;

Amended App. to AFMC's Cmts. Concerning Commerce's Final Results of Redetermination

Pursuant to Remand at Tab 18, Attach. III ("App. to AFMC's Cmts.").  In the Final Results,

---

[14] Both PSCC 4407.99 and 4407.10 are classified as wood "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6 mm."  PSCC 4407.99 is a basket category while 4407.10 contains only coniferous species. Commerce used other tariff headings to value veneer and plywood inputs.  In the Remand Results, Commerce found that "veneer and plywood are dried in the production process and thus the issue of green versus dried entries of these inputs is not present, because they are already dried when imported. . . .  Therefore, with respect to veneer and plywood, there are no patent complications in calculating surrogate values due to moisture content."  Remand Results at 44. The court makes no decision with respect to veneer and plywood.  Commerce may make whatever adjustments it believes are necessary, consistent with the otherwise applied valuation methodology.

[15] The parties do not challenge the tariff subheadings used by Commerce to determine the value of wood for these particular production factors.

Commerce measured Yihua Timber's consumption of wood by weight, relying on WTA weight-based data rather than Philippines National Statistics Office ("NSO") volume-based data.  Issues and Decision Memorandum at 8.  The court found Commerce's reasoning unsupported by substantial evidence and instructed Commerce on remand to "explain why volume data are not the superior approach given the patent complications with using gross weight data with wood inputs . . . ."  Lifestyle Enter., 768 F. Supp. 2d at 1301.  In its Remand Results, Commerce concluded that WTA gross weight-based data were more reliable than NSO volume-based data[16] because "NSO volume-based data are distorted by the use of standard conversions from weight to volume . . . ."  Remand Results at 9, 15.  Although Philippine customs forms require all importers to report the weight of their entries, importers "sometimes but very seldom" fail to report the volume of their entries.  Remand Results at 41.  When importers do not report volume, Phillipine customs officials calculate volume from reported weight using a formula which Commerce found to be a standard conversion ratio.[17]  Id.  Commerce determined that 46 out of

---

[16] The parties agree that these are the two potentially applicable data sets.  The NSO also keeps data on net weight and gross weight, neither of which are proposed by any party.  Thus, the focus is the choice between weight-based data and volume-based data.

[17] AFMC contends that Commerce's factual basis for this finding is insufficient.  AFMC Cmts. at 9 11.  AFMC also argues that it is equally plausible that the standard conversion ratio could have been used to convert volume-based data into weight-based data.  AFMC Cmts. at 8 9.  Commerce relied upon an e-mail exchange with an employee of the NSO that the "first unit of measure" is kilograms and the second unit of measurement was volume, the latter measurement being "sometimes but very seldom" not reported.  Remand Results at 40 41.  "[W]hen this occurs it is calculated by using a formula that was established by the 'pioneers of the section.'"  Id. at 41.  To the extent that AFMC argues Commerce must distinguish this review from the subsequent Fourth Administrative Review, in which volume-data was used, or questions why Commerce did not rely on this evidence in the Draft Redetermination, those challenges are not based upon any legal requirement.  Absent any evidence to the contrary, the e-

(continued...)

119 import transactions (38.7%) covering the wood factors of production valued with NSO

volume-based data used a standard conversion factor of 0.848.  Id. at 10  11.  Commerce

concluded that because "a portion of the NSO weight-based data were based on standard

conversions from gross weight data, . . . the NSO volume-based data are less reliable than the

WTA weight-based data . . . ."  Id. at 48  49.  The court first examines Petitioners' challenges to

Commerce's choice to use weight-based data, then looks at Commerce's contentions regarding

the alternative volume-based data.

### A.      Weight Data

AFMC challenges Commerce's choice to use weight-based data on the basis that

the weight-based data are significantly distorted by the presence of high-moisture content (or

"green") wood in the tariff headings used to determine the surrogate value.  AFMC's Cmts. at 17.

The Government counters that "given the absence of any record evidence of the moisture/species

mix underpinning the WTA/NSO data, and the existence of alternative explanations for . . . why

the NSO densities exceed the density of the wood used by Yihua, AFMC cannot demonstrate

distortion."  Def.'s Resp. at 8.  AFMC also argues that the presence of packing materials further

distorts the surrogate value if weight data are used.  AFMC's Cmts. at 28  29.

### i.      Distortion Due to Moisture Content

AFMC argues that "the relatively high average density . . . [of] lumber imported

under PSCC 4407.99[] indicates that at least some portion of the imports is comprised of 'green

---

[17](...continued)
mail exchange provides sufficient evidence that the NSO used a formula to convert weight-based
data into volume-based data, not the reverse.

wood.'"  AFMC's Cmts. at 17 (citing <u>Remand Results</u> at 12).[18]  Thus, because Yihua Timber

"consumes <u>only</u> kiln-dried lumber," <u>id.</u>, there is a tremendous risk of substantial undervaluation

of the surrogate value.  <u>Id.</u> at 15.  Commerce acknowledged "a mix of dried and green wood" in

imports under PSCC 4407.99, <u>Remand Results</u> at 12,[19] but "disagree[d] . . . that a density of 670

kilograms per cubic meter is compelling evidence of high moisture content wood," <u>id.</u> at 12.

        Here, the record clearly demonstrates that the use of weight-based data understates

the wood input surrogate value.  Yihua Timber uses only low-moisture, kiln-dried wood, a very

specific subset of the wood imported under the tariff heading.[20]  This type of wood should

command a higher price per kilogram than the average wood imported under that tariff heading

because it yields more cubic meters of wood per kilogram.  The use of weight-based data in

conjunction with a basket tariff heading, therefore, places an artificially low value on the wood

used by Yihua Timber because the inclusion of higher-moisture content wood and wood that

lacks the value added from the kiln-drying process depresses the surrogate value.[21]  Moreover,

---

[18] The parties agree that in general higher moisture results in higher density.

[19] The Government contends that Commerce never made such a finding, Def.'s Resp. at 8, but this contention contradicts the explicit language of the <u>Remand Results</u>, <u>see</u> <u>Remand Results</u> at 12 ("As the Philippine lumber imports are an average density, there is some amount of wood covered above and below the average of 670 kilograms, indicating a mix of dried and green wood.").

[20] Presuming the lumber to have "been dried to a [[
        ]] percent" as AFMC alleges, AFMC Cmts. at 17, it would be reasonable to assume that a majority of the lumber imported does not fit that description.

[21] At oral argument, Lifestyle argued that, as a matter of logic, no company would ever ship green wood into the Philippines because to do so would add unnecessarily to shipping costs,

        (continued...)

*Confidential Data Deleted*

because wooden bedroom furniture requires a certain volume of wood, not a certain weight of wood, this distortion due to the presence of green wood imported under the tariff headings is only present when weight-based data are used.[22]

ii.    **Species Mix**

Commerce rejects AFMC's claim of distortion due to the presence of high-moisture content wood in the relevant tariff headings by arguing that the actual size of this distortion is unknown    and possibly non-existent    because the alleged distortion in the surrogate value might instead be due to species mix.[23]   Remand Results at 45.  The lower per unit

───────────────

[21](...continued)
because the green wood would be heavier due to moisture content.  This line of reasoning fails to account for potential differences in the cost of drying between the Philippines and other countries.  Thus, there is no support in the record for Plaintiff's contentions.

[22] Commerce argues that moisture content also distorts volume data because of shrinkage that occurs during drying which is unaccounted for when the wood is reported by volume. Remand Results at 13.  This contention does not constitute substantial evidence in support of the choice of weight-based data because shrinkage decreases the total cubic meters, implying a higher cost per cubic meter.  Thus, the failure to account for shrinkage likely results in some undervaluation as well, and it cannot be used as the basis for preferring a data set resulting in a greater undervaluation.  See AFMC's Cmts. at 24  25.

[23] Commerce found that "neither database accounts for the different moisture content of green versus dried woods" because both weight-based and volume-based data would be artificially inflated by moisture content.  Remand Results at 13. With regard to the impact of species mix, Commerce found that "species-specific densities roughly correlate to prices: the higher the species-specific density, the higher the price."  Id. at 45.  According to Commerce, this implies that "average values [will] only be improperly diluted if the mix was disproportionately made up of high moisture green wood," id., and because Commerce "[did] not know the full mix of low-moisture kiln dried wood, high moisture green wood, natural low-density woods or natural high-density woods," it concluded that neither data set was preferable on the basis of either moisture content or species mix, id. at 46.
    Commerce supported its finding that species' densities correlate with price based on a broad list of hardwood lumber, whereas AFMC bases its statement to the contrary on a more

(continued...)

cost chosen by Commerce theoretically might be accurate because some of the wood imported

into the Philippines could be of higher quality than the wood used by Yihua Timber.  See id. at

45 ("[T]he average value of any basket HS category will be a function of the mix of natural high

density woods, low density woods, and high moisture content green woods.").

    High-moisture content wood has a definitive value-suppressing effect when

weight-based data are used.  In contrast, the impact of species mix has variable and indeterminate

effects based on the record and Commerce's findings.  Although it is true that species mix could

have the effect of overvaluation under both data choices, it is does not have the same clearly one-

sided impact as high-moisture content wood on weight-based data.  Without regard to the impact

of high-moisture content wood, species mix affects valuation in three different ways, contingent

upon the correlation between species and the price of wood.  First, where price rises faster than

density as between two types of wood, weight-based data are preferable because although

weight-based data still overvalue the types of wood in question, the use of volume-based data

would result in an even greater distortion.  Second, where price drops with an increase in density,

volume-based data would be preferable because although both data sets undervalue wood, the

use of volume-based data would result in less of an undervaluation than the use of weight-based

data.  (Commerce rejected this possibility.)  Third, for all correlations falling in between where

price rises but not as fast as density, no clear choice exists because both volume-based and

---

[23](...continued)
limited list of lumber chosen from Yihua Timber's briefing at the agency level.  See Def.'s Resp.
at 9; Remand Results at 45; AFMC's Reply to Def.'s Resp. Regarding the Final Results of
Redetermination at 6.  So long as the selection is reasonable, Commerce may select any list in
order to demonstrate the correlation between price and density.  Commerce, however, made no
findings as to the degree of the correlation or its impact on the surrogate value.

weight-based data will be distorted by species mix.  Commerce made no finding as to whether

density correlates with price in a manner similar to the first or the third scenarios.

Commerce acknowledged that the impact of species mix did not provide a basis

upon which to find that volume-based data were superior to weight-based data.  See Remand

Results at 47 ("[S]everal variables affecting the numerator and denominator cannot be quantified

using data on the record . . . .  Therefore, there is no basis to state that the NSO volume data is

superior to WTA weight data for purposes of calculating surrogate values . . . .").  Critically,

Commerce did not find that the impact of species mix on volume-based data was comparable to

or exceeded the impact of high-moisture content wood on weight-based data.  Commerce simply

found that species mix did not support the assertion that volume-based data were superior.  A

wider variety of results require additional findings before species mix may be used as a basis for

rejecting volume-based data in favor of weight-based data in this case.   In contrast, moisture

content necessitates no balancing because moisture content cannot result in an overstatement of

value determined by volume-based data.  Commerce's findings as to species mix were therefore

insufficient to support Commerce's next logical step: the rejection of volume-based data in favor

of weight-based data.  Without additional evidence showing that a clearer correlation between

price and density for the woods covered by PSCC 4407.99 and 4407.10, or at least showing that

the higher-value woods were a substantial import into the Philippines, species mix distortions do

not provide substantial evidence to support Commerce's preference for weight-based data.

### iii.        Packing Materials in Gross-weight Data

AFMC argues that Commerce has failed to explain "why use of a weight-based

approach is not distortive given that 'different types of packaging of the same wood may result in

distortions in the gross-weight data.'" AFMC Cmts. at 28 (quoting <u>Lifestyle Enter.</u>, 768 F. Supp. 2d at 1301).  Commerce seems to have conceded that packing materials are included in some of the data, because it agreed that it did "not have sufficient information on this record to conclude that packing does not generally account for the divergent differences in gross versus net weight data from the NSO . . . ."[24]  <u>Remand Results</u> at 14.  Thus, inclusion of packing materials may be one more reason why weight-based data should not be used.  At the very least it does not weigh against using volume-based data.

## B.      Volume Data

Having concluded that the record evidence that weight-based data are clearly distortive due to, at least, the presence of high-moisture content wood is uncontradicted, the court now turns to volume-based data, the alternative considered and rejected by Commerce.  At oral argument, the Government conceded that the sole basis upon which Commerce rejected volume-based data was that a certain percentage of imports under the relevant tariff headings converted weight-based data into volume-based data using a standard conversion ratio.[25]  AFMC argues that

---

[24] Commerce added that packing did not account for the divergence in gross versus net weight data "in instances where the value recorded under net weight is larger than the value recorded for the gross weight of the same transaction."  <u>Remand Results</u> at 14  15.  Commerce does not explain how the value of a net weight transaction could ever be larger than the value of a gross weight transaction.  <u>Id.</u> at 15.  Based on the logical incoherence of such a situation and the absence of an explanation, those instances may be excluded from consideration.

[25] In its prior opinion, the court rejected Commerce's finding of "anomalies . . . in separate sections of the tariff code, pertaining to nails and adhesives," <u>Lifestyle Enter.</u>, 768 F. Supp. 2d at 1302 n.18, as a basis for relying on weight-based data or volume-based data.  <u>Id.</u> at 1302 ("Commerce did not support its finding that numeric anomalies present in the NSO data are not present in the WTA data or why measuring the input in gross weight is superior to measuring the input by volume").  Commerce did not rely on this finding in its <u>Remand Results</u> and

(continued...)

the standard conversion ratio affects an insignificant number of relevant wood imports and

therefore is an improper basis upon which to discard the NSO volume-based data.  AFMC's

Cmts. at 6.

In the preliminary remand results, Commerce found that 38% of data for

transactions in the NSO volume-based data set were the result of the use of a standard conversion

ratio, not the actual reported volume.  Remand Results at 10 11.  In the final Remand Results,

Commerce agreed with AFMC that this percentage was based on the number of transactions and

that when measured by volume or quantity "the application of the standard conversion of 0.848

to the inputs of ash, poplar and pine appears to be minimal . . . ."  Id. at 42.[26]  Given Commerce's

agreement that the standard conversion ratio is demonstrated to be distortive of only a very small

amount of the volume data (apparently about 1%), and the fact that the transactions affected by

--------

[25](...continued)
explicitly disavowed this position at oral argument.

[26] On brief, the Government argues that the limited use of a standard conversion ratio "is
merely speculation because Commerce cannot look behind the aggregate numbers used in both
the NSO and WTA data."  Def.'s Resp. at 7.  The Government conjectures that "[a] more
plausible assumption would be that the small country imports represented single importers or
filers, who always failed to report actual volume, whereas, some fraction of importers from the
larger countries reported actual volume in conjunction with the required weight field," thereby
masking "the use of a standard conversion factor . . . for the 99 percent of the imports to which
AFMC refers."  Id. at 8 (citing Remand Results at 41).  Commerce, however, did not reach this
conclusion, finding that it "cannot determine whether, as Yihua argues, the standard conversion
was applied to a significant portion of these inputs but masked by the concurrent application of
specific conversions."  Remand Results at 8, 40, 42 ("While we agree with Yihua Timber that it
is possible that the standard conversion was used in combination with actual reported volumes,
thereby masking its use, we cannot know for certain that this is the case").  Although Commerce
cannot be sure that the standard conversion ratio is limited to 1% of all imports under the
relevant tariff heading, Commerce cannot be sure that is not limited to 1%.  Such a finding is
insufficient to support a preference for either the use of weight-based data or volume-based data.

the standard conversion ratio may even be removed, the mere presence of a standard ratio being

used in some circumstances does not constitute substantial evidence supporting the use of

weight-based data.[27]

There is no question that a distortive conversion ratio is being used in all cases if

weight-based data are the metric chosen and any amount of green wood was imported under the

relevant tariff headings, as Commerce concluded was the case.  Speculation as to the impact of

species mix and a widespread use of a standard conversion ratio from weight to volume are

unsupported by the evidence.  Commerce has yet to provide a single significant reason why the

use of volume-based data does not resolve all or nearly all of the patent complications with the

use of weight-based data.  Given the above discussion, it seems clear that problems inherent in

use of weight data necessarily result in an undervaluation, and any use of such data could only be

justified if volume data were at least as distortive.  The court finds Commerce has failed to

support its rejection of a volume-based approach, and therefore, Commerce's decision to use

WTA weight-based data in lieu of NSO volume-based data is not based on substantial

evidence.[28]  On this record, there are only two choices, and only the selection of volume-based

---

[27] Although there is some concern about failing to account for shrinkage, Remand Results
at 13, as this would imply an understatement of value by using volume because shrinkage would
decrease the denominator (total cubic meters), implying a higher cost per cubic meter.  See
AFMC's Cmts. at 24  25.  Nonetheless, this distortion is favorable to respondent's and is
accepted by AFMC.  Commerce does not claim it outweighs the distortion in the other direction
caused by weight-based data.

[28] Even if we ignore the Government's reliance solely on the standard conversion ratio
and interpret Commerce's Remand Results expansively to find that species mix and high-
moisture content wood render weight-based data and volume-based data equally flawed,
Commerce has still failed to comply with the court's instruction to "explain why volume data are
(continued...)

data is supported.

## III.    Use of Diretso's Financial Statements

The court instructed Commerce to "determine if the financial statements match the correct company." Lifestyle Enter., 768 F. Supp. 2d at 1308.   AFMC argues that "[t]he record conclusively demonstrates that the financial statements of Diretso Design . . . match the website at www.diretso.com." AFMC Cmts. at 30.  Specifically, AFMC argues that Diretso Design's audited financial statement list www.diretso.com as the company's website, provide the same physical address as the website, refer to the same manufacturing plant, and bear the same logo. Id. at 30 31.  Commerce agreed that the contact information, "address, logo, [and] principal activity" were the same in the financial statement and on www.diretso.com but found that the financial statement did "not address the issue that an affiliation may exist between Diretso Design and Diretso Trading, nor does it definitively demonstrate that www.diretso.com . . . belongs solely to Diretso Design, rather than Diretso Trading.[29]  Remand Results at 18, 50.

---

[28](...continued)
not the superior approach given the patent complications with using gross weight data with wood inputs . . . ." Lifestyle Enter., 768 F. Supp. 2d at 1301.  When instructed by the court to explain which data set is superior, Commerce must do more than inform the court that it lacks the ability to determine which data set is better.  Commerce has chosen to discard the obvious choice of volume-based data, as Yihua Timber requires a certain volume of wood   not a particular weight of wood   to produce wooden bedroom furniture.  See, e.g., App. to AFMC's Cmts. at Tab 1, Ex. D-11.

[29] AFMC argues that Commerce impermissibly relied on a third-party website.  AFMC Cmts. at 30 32.  In part, Commerce declined to use Diretso Design because a third-party website indicated that www.diretso.com was registered to Diretso Trading.  Remand Results 17 18.  Commerce agreed with AFMC "that it is the Department's practice not to rely on third-party websites to call into question the credibility of the audited financial statements." Id. at 50.  On account of Commerce's practice, Commerce chose to focus its "analysis on the information

(continued...)

Because Commerce had six other usable financial statements, it chose not to rely on the financial statements of Diretso Design.[30]  Id. at 18.  Given Commerce's inability to conclusively identify the owner of www.diretso.com or to ascertain the relationship between Diretso Design and Diretso Trading, Commerce permissibly concluded that the other six financial statements were sufficient.  Thus, Commerce presented substantial evidence in excluding the financial statement of Diretso Design.

---

[29](...continued)
contained in the financial statements and the www.diretso.com website, as well as, the factual information submitted by Petitioners from the SEC of the Philippines for Diretso Trading."  Id.  Commerce clearly chose to rely on other evidence.  Thus, the issue is irrelevant.

[30] Commerce found that Diretso Design's sales figures do not match the website's contention that it has sales in thirty-seven overseas markets.  Remand Results at 50.  It seems that Commerce, in expanding the record on remand, examined a more recent version of the website with updated information and sales figures.

## CONCLUSION

For the foregoing reasons, the court remands the matter for Commerce to redetermine Orient's AFA rate and, unless it chooses to reopen the record to gather more evidence, to use the volume data set for wood inputs.  Commerce's determination as to the financial statements of Diretso Design is sustained.

Commerce shall file its remand determination with the court within 60 days of this date.  The parties have 30 days thereafter to file objections, and the Government will have 15 days thereafter to file its response.


                                                                        /s/ Jane A. Restani
                                                                         Jane A. Restani
                                                                             Judge

Dated: This 28th day of March, 2012.
          New York, New York.