**Slip Op. 12-**116

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                      :

LIFESTYLE ENTERPRISE, INC., TRADE   :
MASTERS OF TEXAS, INC., EMERALD HOME  :
FURNISHINGS, LLC, RON'S WAREHOUSE   :
FURNITURE D/B/A VINEYARD FURNITURE  :
INTERNATIONAL LLC,                   :
                      :
          Plaintiffs,           :
                      :
        and               :
                      :
DREAM ROOMS FURNITURE (SHANGHAI)   :
CO., LTD., GUANGDONG YIHUA TIMBER   :
INDUSTRY CO., LTD.,               :
                      :
        Consolidated Plaintiffs,  :
                      :
ORIENT INTERNATIONAL HOLDING     :
SHANGHAI FOREIGN TRADE CO., LTD.,   :
                      :
        Intervenor Plaintiff,   :
                      :
        v.               :   Before: Jane A. Restani, Judge
                      :
UNITED STATES, UNITED STATES      :   Consol. Court No. 09-00378
DEPARTMENT OF COMMERCE        :
                      :   **Public Version**
        Defendants,          :
                      :
        and               :
                      :
AMERICAN FURNITURE MANUFACTURERS :
COMMITTEE FOR LEGAL TRADE,      :
VAUGHAN-BASSETT FURNITURE       :
COMPANY, INC.                 :
                      :
        Intervenor Defendants.  :
_____ :

## OPINION AND ORDER

[Commerce's <u>Remand Results</u> remanded in part and sustained in part.]

Dated: September 7, 2012

   <u>Jill A. Cramer</u>, <u>Kristin H. Mowry</u>, <u>Jeffrey S. Grimson</u>, <u>Sarah M. Wyss</u>, and <u>Susan L. Brooks</u>, Mowry & Grimson, PLLC, of Washington, DC, and <u>John D. Greenwald</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, for plaintiffs.[1]

   <u>William E. Perry</u>, Garvey Schubert Barer, of Washington, DC, for consolidated plaintiff, Dream Rooms Furniture (Shanghai) Co., Ltd.

   <u>John D. Greenwald</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, and <u>Patrick J. McLain</u>, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, for consolidated plaintiff, Guangdong Yihua Timber Industry Co., Ltd.

   <u>Nancy A. Noonan</u> and <u>Matthew L. Kanna</u>, Arent Fox LLP, of Washington, DC, for intervenor plaintiff.

   <u>Stuart F. Delery</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, <u>Stephen C. Tosini</u>, Senior Trial Counsel, <u>Carrie A. Dunsmore</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendants.  Of counsel on the brief was <u>Shana Hofstetter</u>, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for the defendants.

   <u>J. Michael Taylor</u>, <u>Joseph W. Dorn</u>, <u>Daniel L. Schneiderman</u>, and <u>Prentiss L. Smith</u>, King & Spalding, LLP, of Washington, DC, for intervenor defendants.

   Restani, Judge: This matter comes before the court following the court's decisions

in <u>Lifestyle Enterprise, Inc. v. United States</u>, 768 F. Supp. 2d 1286 (CIT 2011) ("<u>Lifestyle I</u>"), in

which the court remanded <u>Wooden Bedroom Furniture from the People's Republic of China:</u>

<u>Final Results of Antidumping Duty Administrative Review and New Shipper Reviews</u>, 74 Fed.

Reg. 41,374 (Dep't Commerce Aug. 17, 2009) ("<u>Final Results</u>") to the U.S. Department of

---

[1] Mowrey & Grimson, PLLC withdrew as counsel for Ron's Warehouse Furniture on January 6, 2011.  The court gave Ron's Warehouse Furniture thirty days to retain counsel.  It has not done so as of the date of this opinion.

Commerce ("Commerce" or the "Department") and Lifestyle Enterprise, Inc. v. United States,

844 F. Supp. 2d 1283 (CIT 2012) ("Lifestyle II"), in which the court remanded Final Results of

Redetermination Pursuant to Remand (Dep't Commerce Aug. 26, 2011) (Docket No. 132) ("First

Remand Results") to Commerce.  For the reasons stated below, the court finds that Commerce

complied with the court's remand instructions with regard to the selection of the surrogate value

for wood input, but Commerce has not complied with the court's remand instructions regarding

Orient's AFA rate.  Thus, Commerce's Second Remand Results are sustained in part and

remanded in part.  See Final Results of Redetermination Pursuant to Second Remand (Dep't

Commerce June 11, 2012) (Docket No. 183) ("Second Remand Results").

## BACKGROUND

The facts of this case have been well-documented in the court's previous

opinions.  See Lifestyle I, 768 F. Supp. 2d at 1293  95; Lifestyle II, 844 F. Supp. 2d at 1286  87.

The court presumes familiarity with these decisions but briefly summarizes the facts relevant to

this opinion.

The plaintiffs, Lifestyle Enterprise, Inc. ("Lifestyle"), Orient International Holding

Shanghai Foreign Trade Co., Ltd. ("Orient"), Guangdong Yihua Timber Industry Co., Ltd.

("Yihua Timber"), Dream Rooms Furniture (Shanghai) Co., Ltd., Ron's Warehouse Furniture,

Emerald Home Furnishings, LLC, and Trade Masters of Texas, Inc., and intervnor defendants

American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture

Company, Inc. (collectively "AFMC") challenged the Final Results of an administrative review

of the antidumping ("AD") duty order on wooden bedroom furniture from the People's Republic

of China ("PRC" or "China"), which assigned Orient a weighted average dumping margin[2] of

216.01% as part of the PRC-wide entity and Yihua Timber the dumping margin of 29.89%.  See

Final Results, 74 Fed. Reg. at 41,380; Wooden Bedroom Furniture from the People's Republic of

China: Amended Final Results of Antidumping Duty Administrative Review and New Shipper

Reviews, 74 Fed. Reg. 55,810, 55,811 (Dep't Commerce Oct. 29, 2009).  Upon considering the

parties' motions for judgment on the agency record, the court held, inter alia, that substantial

evidence did not support denial of a separate rate for Orient and that the rate of 216.01%

assigned to Orient was not corroborated.  Lifestyle I, 768 F. Supp. 2d at 1296 99.  The court also

held that substantial evidence did not support Commerce's decision on the data set for wood

inputs.  Id. at 1301 02.  The court remanded for reconsideration or further explanation.  Id. at

1314 15.  On remand, Commerce 1) found "that the information on the record corroborates the

rate of 216.01 percent, as it relates to Orient," based on total adverse facts available ("AFA"),

and 2) "continue[d] to find that it is appropriate to value wood inputs using [World Trade Atlas

("WTA")] import data."  First Remand Results 8, 31.  Despite Commerce's explanation, the

court found that Commerce had not presented substantial evidence linking the source of the

---

[2] A dumping margin is the difference between the normal value ("NV") of merchandise and the price for sale in the United States.  See 19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35). Unless nonmarket economy methodology is used, NV is either the price of the merchandise when sold for consumption in the exporting country or the price of the merchandise when sold for consumption in a similar country.  19 U.S.C. § 1677b(a)(1).  An export price or constructed export price is the price that the merchandise is sold for in the United States.  19 U.S.C. § 1677a(a)-(b).  Under its nonmarket economy AD methodology, Commerce calculates NV "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  Surrogate values from market economy countries are used as a measure of these costs.  See id.; GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337, 1347 (CIT 2010), aff'd, 666 F.3d 732 (Fed. Cir. 2011).

216.01% AFA rate to Orient and therefore "Commerce ha[d] failed to show some relationship

between the AFA rate and the actual dumping margin."  Lifestyle II, 844 F. Supp. 2d at 1291

(internal quotation marks and citations omitted).  The court also found that Commerce had

"failed to support its rejection of a volume-based approach," and instructed Commerce that

"unless it chooses to reopen the record to gather more evidence, to use the volume data set for

wood inputs."  Id. at 1297  98.[3]

        In the Second Remand Results, Commerce chose not to reopen the record and

recalculated the valuation of wood inputs using NSO volume-based data.  Second Remand

Results 1, 7.  Commerce also calculated a new AFA rate of 130.81% for Orient.  Id. at 9.

Plaintiff Lifestyle challenges Commerce's determination regarding Orient's AFA rate.  Cmts. of

Lifestyle Enterprise, Inc., Trade Masters of Texas, Inc. and Emerald Home Furnishings, LLC on

Department of Commerce June 11, 2012 Final Results of Redetermination Pursuant to Second

Remand 12 ("Lifestyle Cmts.").  Yihua Timber challenges Commerce's use of NSO volume-

based data to value wood inputs.[4]  Yihua's Cmts. on Commerce's Final Results of

Redetermination Pursuant to Second Remand 1 ("Yihua Timber Cmts.").  The Government and

AFMC ask the court to sustain the Second Remand Results.  Def.'s Resp. to Pls.' Remand Cmts.

1 ("Def.'s Resp."); AFMC's Cmts. Concerning Commerce's Final Results of Redetermination

---

        [3] Commerce also "decided not to rely on the financial statements of Diretso Design[.]"
First Remand Results 18.  The court sustained Commerce's determination on that issue.
Lifestyle II, 844 F. Supp. 2d at 1298.

        [4] Lifestyle adopts Yihua Timber's arguments.  Lifestyle Cmts. 17.

Pursuant to Second Remand 1 ("AFMC Cmts.").[5]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not

uphold Commerce's final determination in an AD review if it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Orient's AFA Rate

Lifestyle argues that Orient's AFA rate was not reasonably reflective of Orient's

commercial reality, punitive, and "aberrantly high and egregiously out of line with the rate

calculated for Yihua [Timber], a comparable company."  Lifestyle Cmts. 8  9, 11.  Specifically,

Lifestyle contends that Commerce used an insufficient percentage of Yihua Timber's sales,

yielding an excessively high AFA rate.[6]  Id. at 9  10.  This claim has merit.

---

[5] Yihua Timber also filed a motion for leave to file an additional motion for judgment on the agency record.  Yihua's Motion for Leave to File an Additional Motion for J. on the Agency R. Under Rule 56.2, Consol. Ct. No. 09-00378, Docket No. 186, at 1 ("Yihua Timber's Mot. for Leave to File"); Consolidated Pl. Guangdong Yihua Timber Indus. Co., Ltd.'s Mem. in Support of Additional Mot. for J. on the Agency R. Under Rule 56.2 at 1.  The court denied the motion and instructed the parties to "follow the comment procedures as previously ordered by the court." Order, Consol. Ct. No. 09-00378, Docket No. 187, at 1.

[6] Lifestyle offers its own methodology, which reflects Commerce's methodology in all respects except it uses 30% of Yihua Timber sales, as opposed to [[      ]] used by Commerce. Lifestyle Cmts. 13.  Lifestyle's proposed methodology yields a rate of 62.94%.  Id.  The court need not consider plaintiffs' methodological proposals as the statute tasks Commerce with such efforts.

*Confidential Information Deleted*

If an interested party has failed to cooperate in not providing valid data upon

which Commerce can calculate an AD rate, Commerce may calculate a rate using inferences

which are "adverse to the interests of that party in selecting from among the facts otherwise

available." 19 U.S.C. § 1677e(b).  In doing so, Commerce may rely on information derived from

the petition, a final determination in the investigation, any previous review, or any other

information placed on the record.  Id.  "An AFA rate must be 'a reasonably accurate estimate of

the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-

compliance.'"  Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010)

(quoting F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032

(Fed. Cir. 2000)).  "Commerce may not select unreasonably high rates having no relationship to

the respondent's actual dumping margin."  Id.  Although the exact limits of the corroboration

requirement are not clear here, corroboration pursuant to 19 U.S.C. § 1677e(c) is not sought

because Commerce selected a margin based on information from the current POR.  The AFA rate

selected by Commerce nevertheless must be supported by substantial evidence.  Selection of an

AFA rate based on minuscule data will not suffice.  An AFA rate must not be aberrant or

punitive, and should bear a rational relationship to respondent's commercial reality.[7]  See KYD,

Inc. v. United States, 607 F.3d 760, 767  68 (Fed. Cir. 2010) (Commerce's determination is not

punitive where it is in accordance with statutory requirements); Essar Steel Ltd. v. United States,

678 F.3d 1268, 1276 (Fed. Cir. 2012) ("The imposition of adverse facts can be inappropriate if it

---

[7] Rare, if not impossible, are the facts such that a rate would reflect a respondent's commercial reality but be punitive or aberrant, or vice versa.  Commerce's compliance with the statute, by supporting its determination with substantial evidence, often fulfills all of the various formulations of the hurdles established heretofore by case law.

is overly punitive.").[8]

   In the draft Second Remand Results, Commerce calculated a new AFA rate for
Orient based on Yihua Timber's revised dumping margin of 40.74% and "added an additional
amount to ensure compliance by only selecting Yihua Timber's sales transactions that produced
positive margins," thereby assigning Orient an AFA rate of 46.53%.  Second Remand Results 1,
8.  After the draft results, Commerce "determined that the 46.53 percent rate [was] not
sufficiently adverse to provide respondents with an incentive to cooperate."  Id. at 8 (internal
quotation marks and footnote omitted).  Commerce is likely not incorrect in this regard.  The
next step is more problematic.  In the final Second Remand Results, Commerce examined an
invoice from Orient's section A questionnaire response, which Orient had not withdrawn.  Id.
Commerce then selected CONNUM-specific margins for Yihua Timber's sales of the same
product types sold by Orient as reflected in the invoice, selected the highest specific margin for
each of Yihua Timber's products (excluding margins over 216%), and then averaged those
margins together for an AFA rate of 130.81%.[9]  Id.

_____

  [8] AFA rate cases are fact-specific and attempts to reduce precedent to a calculated rate or
percentage of sales are likely oversimplifications.  See Qingdao Taifa Grp., Co. v. United States,
780 F. Supp. 2d 1342, 1350 n.8 (CIT 2011) ("Taifa IV").

  [9] Commerce used the following margins (with quantity and product): [[

                     ]] Analysis
Memorandum for the Final Redetermination Pursuant to Remand: Orient Int'l (June 11, 2012),
App. to AFMC's Cmts. Concerning Commerce's Final Results of Redetermination Pursuant to
Second Remand ("AFMC App."), Tab 5, Attach. II, at 6.
  The AFA rate is based on [[      ]] of Yihua Timber's sales by value and [[      ]] of
                    (continued...)

*Confidential Information Deleted*

Here, Commerce has based Orient's AFA rate on an impermissibly small percentage of the sales of a different but cooperating respondent. In Lifestyle II, the court cautioned that "[s]pecific transactions are generally uninformative." 844 F. Supp. 2d at 1291 n.9; see KYD, 607 F.3d at 767 (stating that Commerce had validated an AFA rate in the prior review through "high-volume transaction-specific margins for cooperative companies"). Cases such as Ta Chen and PAM lie at the outer reach of an acceptable percentage of sales upon which to base an AFA rate and have additional facts that make the small percentages less troubling there. See Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002) (finding that 0.04% of respondent's sales reflected a partial AFA rate of 30.95% where actual sales data was "reflective of some, albeit a small portion, of [respondent's] actual sales"); PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009) (finding that 0.5% of non-cooperating respondent's sales supported an AFA rate of 45.49%). Some of the product-specific margins Commerce relied upon here were based on a single transaction where the percentage of product-specific sales was even smaller than the percentages accepted in Ta Chen and PAM. Generally, a larger percentage of a party's sales data is needed to support a very high margin. See Taifa IV, 780 F. Supp. 2d at 1350 (finding Commerce provided substantial evidence for an

---

[9](...continued)
Yihua Timber's sales by quantity. Lifestyle Cmts. Ex. 1, at 3. Products yielded different proportions. For example, [[

]] sales by quantity. See Analysis Memorandum for the Final Redetermination Pursuant to Remand: Orient Int'l (June 11, 2012), AFMC App., Tab 5, Attach. II. at 6.

*Confidential Information Deleted*

AFA rate of 145.90% where Commerce relied on 36% of the non-cooperating respondent's

verified sales data from the last year in which it cooperated); <u>Mid Continent Nail Corp. v. United

States</u>, 712 F. Supp. 2d 1370, 1378 (CIT 2010) (providing that, in the context of targeted

dumping, 33% is considered reasonable for establishing a pattern of activity); <u>iScholar, Inc. v.

United States</u>, Slip Op. 11-4, 2011 WL 109014, at *2  3 (CIT Jan. 13, 2011) (sustaining a rate of

72.03% based on a single transaction of around 50 units by a cooperating respondent because the

transaction was "within the mainstream").  The transactions selected by Commerce, the very

highest CONNUM-specific margins under 216.01%, were clearly outside the mainstream.[10]

    Lifestyle also alleges that Commerce engaged in a "closed-door session with

counsel to the AFMC," "gave no warning to the parties" prior to the final results, "did an about

face," and "did not provide parties with an opportunity to file" comments after the final <u>Second

Remand Results</u>.  Lifestyle Cmts. 5  6.  Although Lifestyle does not make any legal claims based

on these actions, Commerce's methodology was new to the plaintiffs.  In the draft <u>Second

Remand Results</u>, Commerce discussed only an AFA rate of 46.53%, comprised of Yihua

---

[10] AFMC cites <u>KYD, Inc. v. United States</u>, which sustained Commerce's methodology of
using the highest product-specific margins of a cooperating respondent as the basis for an AFA
rate of a non-cooperating respondent.  807 F. Supp. 2d 1372, 1378 (CIT 2012).  The principal
issue in KYD was whether Commerce was required to use a modified version of the non-
cooperating respondent's data.  <u>Id.</u> at 1376  77.  The court found that Commerce was not.  <u>Id.</u> at
1378.  Instead, the court held that "because [the non-cooperating respondents] did not provide
sufficient usable information for the record, Commerce's transaction-specific margin for an
adverse rate does not conflict with statutory requirements, and Commerce's selection is based on
substantial evidence, the Second Remand Results will be sustained."  <u>Id.</u> at 1378 (finding an
AFA rate of 94.62% supported by substantial evidence).  The final AFA rate in <u>KYD</u> was
substantially lower than the rate in the instant case.  Additionally, the court did not find that the
product-specific margins used by Commerce were outside the mainstream of the cooperating
respondent's normal transactions, as they are in the instant case.

Timber's calculated rate of 40.74% plus an additional amount to encourage compliance.  Draft Results of Redetermination Pursuant to Second Remand, Conf. App. to Cmts. of Lifestyle Enter., Inc., Trade Masters of Texas, Inc. and Emerald Home Furnishings, LLC on Dep't of Commerce June 11, 2012 Final Results of Redetermination Pursuant to Second Remand ("Lifestyle App."), Tab 1, at 10.  In the final Second Remand Results, Commerce considered AFA rates of 216.01%, 130.81%, 100%, and 69%.[11]  Commerce would be well-served by giving parties an equal opportunity to respond to    as well as providing adequate time to comment on significant changes in    methodology.

Lastly, Commerce has ignored the court's remand instructions in Lifestyle I and Lifestyle II.  Commerce failed to comply with the court's remand order because Commerce did not follow the court's direction that Commerce "should start with the highest rate calculated for a comparable respondent or respondents and then add an additional amount to ensure compliance." Lifestyle II, 844 F. Supp. 2d at 1291 n.13.  Additionally, Commerce still has not explained why Orient's rate increased so dramatically from its prior margin.  See Lifestyle I, 768 F. Supp. 2d at 1299; Lifestyle II, 844 F. Supp. 2d at 1290.  "When rates are in multiples of 100%, one might assume that a bit more corroboration or record support is warranted."  Qingdao Taifa Grp., Co. v. United States, 760 F. Supp. 2d 1379, 1386 n.7 (CIT 2010) ("Taifa III").  Commerce explained that "some relationship between the AFA rate and the actual dumping margin," Lifestyle II, 844 F. Supp. 2d at 1291, was shown because "it is:  a) contemporaneous (i.e., from the instant

---

[11] The methodology and the resulting rate of 130.81% were proposed by AFMC. Excerpts from Petitioners' Cmts. on the Draft Results of Remand (May 31, 2012), AFMC App., Tab 4, at 8.

review), b) from a 'comparable' respondent based on the information on the record, and c) based

on sales of the same types of merchandise sold by Orient during the same period." Second

Remand Results at 16.  If this was all the court required, then the percentage of sales and those

sales' relationship to commercial reality for this respondent would be wholly irrelevant.  But this

is not the case and Commerce must show more.  The use of contemporaneous data, particularly

where data are cherry-picked and manipulated, does not obviate the necessity of Commerce to

provide substantial evidence of a rational relationship between the AFA rate chosen and the

commercial reality of the non-cooperating respondent.  On the facts of this case, a distorted rate

based on a very small percentage of a comparable company's like-product sales does not meet

this threshold.

              Because Commerce's task is to identify the amount necessary to deter non-

compliance, Commerce must look at the relationship between the AFA rate granted in the current

administrative review and the rate of past and present cooperating respondents of comparable

size.  Gallant, 602 F.3d at 1324.  Absent record evidence to the contrary, the difference between

these rates and the AFA rate is the deterrent.  Where the AFA rate is multiples of the baseline,

this indicates that the rate may not be supported by substantial evidence.  See De Cecco, 216 F.3d

at 1032.  An AFA rate over 100% may be some evidence that the rate is punitive.  Taifa III, 760

F. Supp. 2d at 1386 n.7.  Unlike cases in which the rate and amount of deterrent were facially

within the bounds of commercial reality, see, e.g., Ta Chen, 298 F.3d at 1339; PAM, 582 F.3d at

1340, here, Commerce must provide substantial evidence for such a high AFA rate by using, in

some manner, data in the mainstream of normal transactions of cooperating respondents or

otherwise relying upon data reflecting commercial reality.

"Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." KYD, 607 F.3d at 765 66.  But Commerce must select an AFA rate that has not been artificially constructed for the sole purpose of punishing a non-compliant respondent.  By selecting a very small number of the highest product-specific margins from a different respondent, Commerce appears to have done just that.  Thus Commerce's determination that Orient should receive an AFA rate of 130.81% is not supported by substantial evidence.

## II.      Wood Input Valuation

Yihua Timber argues that Commerce erred when it did not consider two alternatives to NSO volume-based data to value certain wood inputs.  Yihua Timber Cmts. 2.  No other party challenges Commerce's decision to use NSO volume-based data over WTA weight-based data in the Second Remand Results, and Yihua Timber's challenge is too late.  Therefore, the court sustains Commerce's determination on this issue.

A party has waived an argument where it does not present the argument "until after it ha[s] filed its principal summary judgment brief . . . [because] parties must give a trial court a fair opportunity to rule on an issue . . . ."  Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002); KYD, Inc. v. United States, 836 F. Supp. 2d 1410, 1414 n.2 (CIT 2012).  "[A]ll claims, arguments, and objections that [a plaintiff has] elected not to address in its post-remand briefs must be deemed waived."  Bond Street, Ltd. v. United States, 774 F. Supp. 2d 1251, 1261 n.4 (CIT 2011).

In 2009, prior to the Final Results, Yihua Timber argued that Commerce should
not rely on NSO volume-based data to calculate the surrogate values for various wood inputs, as
Commerce had done in the Preliminary Results.  Issues and Decision Memorandum for the
Antidumping Duty Administrative and New Shipper Reviews of Wooden Bedroom Furniture
from the People's Republic of China, A 570 890, POR 1/1/07-12/31/07, at 7 (Aug. 10, 2009)
("Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/prc/E9-
19666-1.pdf (last visited Aug. 27, 2012).  Yihua Timber also argued that Commerce should not
use Philippine Harmonized Tariff Schedule ("HTS") codes to value lumber and plywood.  Id.
Instead, Yihua Timber proposed that Commerce use domestic market data from the Philippines
Forest and Management Bureau, export data from the United States to the Philippines, or export
data from the United States to the PRC.  Id.  Yihua Timber had placed WTA weight-based data
on the record in 2008 and also proposed using NSO weight-based data which it considered
"substantially the same as the Philippine import data published in the World Trade Atlas . . . ."
Case Br. of Guangdong Yihua Timber Indus. Co., Ltd. (May 28, 2009), P.R. 557, at 12; Yihua
Timber's Submission of Surrogate Factor Values (Nov. 4, 2008), P.R. 403, Ex. 1, at 1.
Commerce rejected NSO volume-based data and also declined to use any of Yihua Timber's
proposed alternatives.  Issues and Decision Memorandum 8 9.  Instead, Commerce relied on
WTA weight-based data.  Id. at 6 7.  In its complaint before this court, Yihua Timber contested
Commerce's use of WTA weight-based data as a surrogate value for poplar, ash, and plywood on
the basis that reliable domestic market price data existed.  Complaint, Consol. Ct. No. 09-00398,
Docket No. 15 at 12.  Yihua Timber neither moved for summary judgment on this issue nor

argued against AFMC's claims regarding NSO volume-based data.  Consol Court. No. 09-00398,

Docket No. 62; Consol Court No. 09-00398, Docket No. 94.  Fellow plaintiff Lifestyle argued

that Commerce's adoption of WTA weight-based data was supported by substantial evidence.

Consol. Ct. No. 09-00398, Docket No. 83, at 25  26.  The court questioned Commerce's use of

WTA weight-based data in Lifestyle I before rejecting it in Lifestyle II.  Lifestyle I, 768 F. Supp.

2d at 1301  02; Lifestyle II, 844 F. Supp. 2d at 1292  97.  When the court reviewed Commerce's

First Remand Results, Yihua Timber filed a one-page brief asking the court to sustain

Commerce's determination and declined to participate in oral argument.  After significant

questioning during two lengthy oral arguments, the court found that "[t]he parties agree that these

are the two potentially applicable data sets."  Lifestyle II, 844 F. Supp. 2d at 1293 n.16.  At the

very least Yihua Timber could have advised the court that it was maintaining an alternate

argument regarding data sets.

       Yihua Timber now argues that Commerce should adopt Philippine volume-based

domestic market data based on species indigenous to the Philippines or export prices from the

United States to the Philippines.  Yihua Timber Cmts. 2.  Specifically, Yihua Timber argues that

NSO volume-based data are inferior to domestic data and export data because NSO data relies on

HTS basket categories and reflects the use of a standard conversion ratio.  Id. at 2  3.  Yihua

Timber argues that domestic data are superior in particular because Commerce has a preference

for domestic over import data.  Id. at 2.  First, the domestic data for which Yihua Timber now

argues were likely more favorable to the plaintiffs than WTA weight-based data.[12]  Thus, Yihua

Timber did not receive a completely favorable result and its claim was ripe after the Final

Results.  Second, whether Commerce should rely on HTS import data or domestic data is an

entirely separate issue from the issue of whether Commerce should rely on weight-based or

volume-based data.  Yihua Timber did have an opportunity to raise this claim on a motion for

summary judgment and chose not to do so there or before the court at any time before Commerce

chose between the two data set options available to it.  By not preserving its claim for orderly

consideration by the court, Yihua Timber has waived it.  Third, the court rejects Yihua Timber's

arguments regarding standard conversion ratio for the same reasons the court did so in its prior

opinion.  See Lifestyle II, 844 F. Supp. 2d at 1296  97.  Yihua Timber was aware of challenges to

the valuation of wood inputs in 2009.  After hours of oral argument and hundreds of pages of

briefs, Yihua Timber cannot appear at the eleventh hour with a claim it set aside more than two

years ago that was clearly related to an open issue.

       Additionally, Commerce has addressed the merits of Yihua Timber's arguments

regarding domestic data and export data.  See Issues and Decision Memorandum 7  9; Second

Remand Results 10  13.  Commerce found that the domestic data were comprised entirely of

tropical lumber not used by Yihua Timber.  Issues and Decision Memorandum 12.  Despite

---

[12] The vast majority of domestic volume data for lumber were [[        ]] than import
values reported by the NSO or the WTA, regardless of whether the values were derived from
weight-based or volume-based data.  See Yihua's Revised Case Br. to Commerce (June 1, 2009),
C.R. 190, at 9, 16  17; Analysis Memorandum for the Final Results (Aug. 26, 2011), C.R. 13, at
Attach. III.

*Confidential Information Deleted*

Yihua Timber's efforts to create a parallel between tropical hardwood lumber (species of

Gmelina, Bagras, Binuang, Philippine Mahogany, Lauan, Narra, Apitong, Tanguile, Kalantas,

and Yakal) and the relevant wood inputs, the tropical woods are simply not the same as poplar

and ash.  Even if the court accepts the principle that Commerce can rely on species of wood

indigenous to a surrogate country as surrogate values for species of wood indigenous to China,

Yihua Timber must put forth more than an article from 1907.  Much has changed, even the

literature of botany, over the past 100 years.  Commerce also found that using U.S. export data

would impermissibly treat the United States as a surrogate country for the PRC.  Issues and

Decision Memorandum 7  9.  Assuming arguendo Yihua Timber's claim is not waived,

Commerce's determination is supported by substantial evidence.

        For reasons stated in its prior opinion, Lifestyle II, 844 F. Supp. 2d at 1292  97,

the court sustains Commerce's decision to value wood inputs using NSO volume-based data.[13]

---

    [13] The court recognizes that Commerce used NSO volume-based data under protest.
Second Remand Results 1.

**CONCLUSION**

For the foregoing reasons, Commerce's determination to value certain wood inputs using NSO volume-based data is sustained.  Commerce's decision to grant an AFA rate of 130.81% to Orient is remanded.

Commerce shall file its remand determination with the court within 60 days of this date.  The parties have 30 days thereafter to file objections, and the Government will have 15 days thereafter to file its response.


                                          ___/s/ Jane A. Restani___
                                          Jane A. Restani
                                          Judge

Dated: This 7th day of September, 2012.
        New York, New York.